[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On October 1, 1991, the plaintiff owned and to this day owns property on Route 163, a public highway located in Montville, Connecticut, known as Assessor's Map 82, Lot 46. The Town of Montville (Defendant) performed a revaluation of all properties in the defendant Town as required by the Connecticut state statutes for the assessment year commencing October 1, 1991.
On October 1, 1991, the defendant valued the plaintiff's property for Ad Valorem tax purposes at a fair market value of $4,011,600 and assessed the property at a 70 percent value of $2,808,120. The valuations and assessments have continued for the years subsequent thereto which are also subject to this appeal.
The plaintiff instituted this appeal from the refusal of the defendant to change its assessment of the plaintiff's property (subject property) for tax purposes as of October 1, 1991. The plaintiff claims that the valuation of the subject property placed thereon by the assessors of the defendant was grossly excessive, disproportionate and unlawful. The defendant denies plaintiff's claim.
This court agrees with the plaintiff that the assessment of the subject property is substantially overvalued.
In property tax appeals, the taxpayer bears the burden of proving that the defendant's assessor's valuation is excessive (substantially overvalued). Stamford Apartments Co.v. Stamford, 203 Conn. 586, 589 (1987). If the taxpayer sustains that burden, the court should ascertain the property's true and actual value. Id.
The subject property, which consists of 12.65+ acres of land with frontage on said Route 163, is in close proximity to Route 395 with direct access to Route 95, both major highways in the State of Connecticut and can also be reached by rail and water. The defendant has adequate school facilities, enjoys lower than average unemployment, and has an adequate and stable work force.
The improvements on the subject property are a main building with two levels, a basement, a warehouse and other CT Page 10445 small structures, all of which consist of 253,820 square feet. The improvements to the subject property were constructed commencing in 1868, with further additions in 1901, 1929, 1930, 1947, 1949, 1951, 1956 and 1960, as evidenced in page 27 of Plaintiff's Expert's Appraisal Report, Plaintiff's Exhibit A.
The subject property has been maintained in an average condition and has been updated and improved to meet the public health code, fire code and building codes of the defendant and State of Connecticut. The property is serviced by all the necessary and required utilities to operate a manufacturing use, including but not limited to public sanitary sewers, public storm sewers, electricity, gas, an on-site well and a functioning sprinkler system throughout said main building and warehouse, with part of the subject property located in a flood plain. The property is encumbered by utility easements, which do not affect the fair market value of the subject property.
On October 1, 1991, the plaintiff operated and still operates on the subject property a fully-operational industrial manufacturing plant engaged in the manufacture and production of paperboard products. This use of the subject property is in compliance with the existing zoning laws of the defendant town.
The highest and best use of the subject property is an industrial manufacturing plant. Although the buildings have some functional obsolescence due to the multiple level design and partitions, it has been utilized by the plaintiff to full capacity. The buildings are in average condition.
Market value is the most probable price, as of a specified date, in terms of money, for which a property should sell after reasonable exposure in an open and competitive market under all conditions requisite to fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
There are three generally recognized methods used to determine market value of a property for ad valorem tax purposes, to wit, (1) the sales comparison approach, (2) the cost approach, and (3) the income approach.
The plaintiff offered evidence of the market value of the subject property based solely on the sales comparison approach. The defendant offered evidence of the market value of CT Page 10446 the subject property based on the sales comparison approach, the cost approach and the income approach.
The valuation based on the income approach was stricken from the record as not reliable and for non-disclosure by the defendant to the plaintiff of specific documentation relied upon by the defendant's expert, Ralph Wilcox (Wilcox) in determining value by this method. Further, Wilcox admitted that he was unable to locate any single-user building leases that were comparable and compatible to the subject property for use in the income approach.
The sales comparison approach, also known as the market comparison approach, is based on an analysis of sales of similar properties. The credibility of this approach depends upon the accuracy of the data collected as well as the degree of similarity of the property sold to the subject property.
The plaintiff's expert, Paul W. Sharp (Sharp) and Wilcox used the sales comparison method to determine the fair market value of the subject property for ad valorem tax purposes.
Based on the sale of five properties which Sharp claimed were comparable to the subject property, he determined that the fair market value of the subject property on October 1, 1991, for ad valorem tax purposes was $1,350,000. Plaintiff's Exhibit A.
Based on eleven recorded sales of improved industrial properties in New London County and four of 16 recorded industrially zoned land, which Wilcox claimed were comparable to the subject property, he determined that the fair market value of the subject property for ad valorem tax on October 1, 1991 was $5,210,800. Defendant's Exhibit 1.
The court finds that the comparable sales utilized by the experts were sufficiently dissimilar to the subject property that such estimates of value did not fairly determine the market value of the subject property for ad valorem tax purposes as of October 1, 1991.
Wilcox's appraisal of the subject property was based on a determination of the fair market value of the property for ad valorem tax purposes as of October 1, 1991, using the cost CT Page 10447 approach.
Under this approach, the expert attempts to determine the cost of rebuilding the structures on the subject property and then depreciates that figure by an amount based on the remaining economic life of the structures. The value of the land is then added to the depreciated value of the improvements to arrive at the fair market value for ad valorem tax purposes.
Utilizing this approach, Wilcox relied upon the Marshall Swift Computerized Cost Estimator data, a recognized service in determining the basic structure cost per square foot of new construction and the percentage of physical and functional depreciation to adjust the estimated cost of the new construction to the market value of the improvements on October 1, 1991. However, the use of the Marshall Swift Computerized Cost Estimator involves subjectivity on the part of the Marshall Swift Computerized Cost Estimator data and on the part of the expert. Wilcox took the system, did what he wanted with it, and used his own judgment and experience in determining the depreciation factor.
Pages 16, 19, 20 and 21 of Defendant's Exhibit 1 describe the improvements on the subject property as "masonry". According to Plaintiff's Exhibit N, the subject property was classified Class "C", manufacturing industrial, which has a life expectancy of forty (40) years.
It is on the above data that the defendant's expert determined the percentage of physical depreciation.
The effective age of the buildings on pages 16, 19, 20 and 21 were 0, 35, 30 and 30 years respectively. Notwithstanding this data, Wilcox overrode the computerized data and decided that 22 years was the effective life of the buildings listed on said four pages of Defendant's Exhibit 1. This decision resulted in a remaining economic age of 18 years.
Based on his claimed expertise and data he examined and the remaining economic life of 18 years, Wilcox determined that the percentage of physical depreciation that should be utilized under the cost approach should be 35 percent. In addition, he determined that the percentage of functional disability of the present buildings should be 15 percent. Therefore, the total percentage of depreciation he used to CT Page 10448 adjust the new construction was 50 percent.
The amount of depreciation deducted by defendant's expert from the cost of new construction on the aforesaid pages was $705,500, $1,759,300, $257,300 and $781,800, a total of $3,503,900. Defendant's Exhibit 1, page 22.
Using the cost approach, Wilcox determined that the cost of new construction for replacing the buildings on plaintiff's property would be $7,052,500. Deducting $3,503,900 from that figure, he arrived at a value of $3,529,300 for the improvements on plaintiff's land.
Further, although Wilcox testified that there were no equally comparable sales of land to utilize in determining the fair market value of defendant's land, he averaged the sale price of four land sales he felt were comparable and arrived at a per acre fair market value of $37,950. Defendant's Exhibit 1, page 14. Therefore, he determined that plaintiff's land had a value of $482,300.
Wilcox then added the land value to the value of the improvements on plaintiff's land and arrived at a market value of $4,011,600 for ad valorem tax purposes as of October 1, 1991, and all subsequent years involved in this appeal.
The defendant's assessor examined the report of Wilcox and agreed with the value of $4,011,600 for the subject property for ad valorem tax purposes as of October 1, 1991.
Proper deference must be given to the judgment and experience of assessors, and, unless their action is discriminatory or so unreasonable that property is substantially overvalued, their opinion and judgment should control in the determination of value for tax purposes. Stamford ApartmentsCo. v. Stamford, supra, 203 Conn. 589.
On a mathematical basis, a building with a 40-year life expectancy and a 22-year effective age would result in a physical depreciation factor of 55 percent. Nonetheless, Wilcox determined that the physical depreciation should be 35 percent and the functional depreciation 15 percent. He also admitted that the lower the percentage of depreciation, the higher the market value of the subject property. The use of the lower depreciation factor coupled with the overall subjectivity in CT Page 10449 Wilcox's analysis casts doubt on the accuracy of his appraisal.
The court cannot accept Wilcox's analysis of the depreciation factor and finds that the appropriate percentage of physical depreciation to be 55 percent and the functional depreciation to be 10 percent resulting in a total depreciation factor of 65 percent. Using this percentage on pages 16, 19, 20 and 21, the court calculates the total depreciation to be $4,555,116.
Deducting this amount from $7,052,500, leaves $2,497,384. After adding to that amount the land value of $482,300 the court finds that the market value of the subject property for ad valorem tax purposes as of October 1, 1991, and all subsequent years involved in this action, is $2,979,684.
The defendant's appeal is sustained and judgment may enter for the plaintiff that the assessments for the tax year October 1, 1991 and the subsequent years involved in this appeal be reduced accordingly, and that the defendant refund or credit to the plaintiff any excess taxes which may have been paid.
Costs are taxed in favor of the plaintiff.
Paul M. Vasington State Trial Referee CT Page 10450